**SCHWING MOTOR COMPANY, Incorporated, a Maryland corporation, Plaintiff,**

v.

**HUDSON SALES CORPORATION, a Michigan corporation, et al.**

**BELAIR ROAD HUDSON, Inc., a Maryland corporation, Plaintiff,**

v.

**HUDSON SALES CORPORATION, a Michigan corporation, et al. Defendants.**

Civ. A. Nos. 6362, 6363.

United States District Court
D. Maryland, Civil Division.
Feb. 28, 1956.

D. Sylvan Friedman and Wilson K. Barnes, Baltimore, Md., for plaintiffs.

William L. Marbury and John Martin Jones, Jr., Baltimore, Md., and Richard W. Larwin and Beaumont, Smith & Harris, Detroit, Mich., for Hudson Sales Corp., Hudson Motor Car Co., and Frank Burnham.

John S. Stanley, Roger A. Clapp and Hershey Donaldson, Williams & Stanley, Baltimore, Md., for Bankert Hudson, Inc., and Martin A. Bankert.

THOMSEN, Chief Judge.

Defendants have moved to dismiss the amended complaints on the ground that they do not state claims upon which relief can be granted in these two actions, which are brought to recover treble damages under the anti-trust laws, 15 U.S.C.A. §§ 1, 2, 15. Motions to dismiss the original complaints on the same ground were granted by Judge Coleman, with leave to amend. The principal question in each case is whether an agreement between an automobile manufacturer and a retail dealer, pursuant to which the manufacturer refuses to renew expiring agreements with two other dealers, and gives the dealer a "virtual monopoly" of the sale of one make of automobile in one city, is a combination or conspiracy to monopolize trade or commerce, or in restraint of trade or commerce, in violation of the Sherman Act and of the Clayton Act.

### The Parties

The amended complaints are essentially similar, and will be referred to as "the complaints". The words "plaintiffs" will be used to mean the plaintiffs in both cases. When differentiation is desirable, "Schwing" will refer to the Maryland corporation, Schwing Motor Company, Inc., its stockholders, and the individual proprietor whose business it took over in 1948; "Belair Road" will refer to the other plaintiff, also a Maryland corporation, and to its sole stockholder.

The defendants in each case are: Hudson Sales Corporation, a Michigan corporation, which "substantially" acts as the sales department of the defendant Hudson Motor Car Company, also a Michigan corporation, Frank Burnham, dealer representative of the two Hudson companies in the Maryland area, and Claude W. Margetts, zone manager of the two companies in the Maryland-District of Columbia area, all of whom will be referred to collectively as "Hudson"; Bankert Hudson, Inc., a Maryland corporation, and Martin A. Bankert, its president, who will be referred to collectively as "Bankert".

### Allegations of the Complaints

Schwing alleges that in 1944 Hudson urged Schwing, then a Ford dealer at 3324–32 Keswick Road in (north) Baltimore, to establish a Hudson agency in Baltimore and surrounding territories at the Keswick Road location, there being then no effective Hudson representation in the Baltimore area. Schwing agreed to become a master franchise dealer for Hudson upon assurance that he would receive an annual quota of 150 Hudson automobiles. Between 1945 and 1950, in accordance with the request and insistence of Hudson, Schwing purchased and improved a used-car lot, improved his

Keswick Road building, purchased adjoining properties, and advertised Hudson automobiles, parts and accessories. The business was successful; in 1951 Hudson recognized Schwing as one of the foremost Hudson dealers in the entire country, and its dealership agreement was renewed each year until September 30, 1952.

Belair Road alleges that it became a Hudson master dealer in 1947, at the suggestion of Hudson, rented a building at 4709 Belair Road in (northeast) Baltimore, purchased equipment, etc. Its dealership agreement was renewed each year until September 30, 1952.

Both complaints allege that in March, 1951, without prior knowledge by plaintiffs, Bankert "opened a Hudson Master Dealership" at Howard and Twenty-fifth Streets, in (north-central) Baltimore; that plaintiffs were assured by Hudson at or about that time that their dealerships would be renewed; and that they were renewed for the year beginning October 1, 1951, but not thereafter.

It is alleged that beginning in September, 1951, defendants, with full knowledge of plaintiffs' contracts, combined, conspired and agreed with each other and with divers other persons, "to restrain a part of the trade and commerce in Hudson automobiles and Hudson automobile parts and accessories among the several States"; and did restrain said trade and commerce in violation of 15 U.S.C.A. § 1, and combined, etc., "to monopolize a part of the trade and commerce in Hudson automobiles", etc. and have "monopolized and attempted to monopolize said trade and commerce", in violation of 15 U.S.C.A. § 2.

The complaints allege that the object and purpose of said conspiracy was to eliminate each of the plaintiffs from competition with Bankert in the sale of such automobiles and parts, to restrain and restrict the interstate shipment of such automobiles and parts, and to create a monopoly thereof in the Baltimore area and the State of Maryland to the end that higher prices might be obtained from the purchasing public, to fix arbitrarily the price of used Hudson automobiles offered in trade for new Hudson automobiles below the true and competitive price thereof in order to obtain abnormally large and non-competitive profits from such trade-ins, and to monopolize the supplying of Hudson parts, accessories and Hudson service to the public in Maryland, particularly in the Baltimore area, in order to obtain higher prices therefor and to render less efficient and less convenient service at higher cost.

Both complaints allege the following specific acts in furtherance of the alleged conspiracy: in violation of its contracts with plaintiffs, Hudson, at the instance of Bankert, refused to deliver to plaintiffs their respective quotas of new Hudson automobiles, although they had been properly ordered and were available; Bankert circulated rumors among plaintiffs' customers, and Burnham told the finance company which financed plaintiffs' sales, that plaintiffs would lose their franchises; Bankert, with the assistance of Hudson, attempted to employ certain persons then employed by plaintiffs; and Bankert induced Hudson to decline to renew the franchise or dealership agreements with plaintiffs which expired on September 30, 1952, and which would otherwise have been renewed. Schwing's complaint adds that Margetts and Burnham asked Schwing to resign his dealership in September, 1951; Belair Road's complaint adds that Hudson advised other dealers not to sell new Hudson automobiles to it. Each plaintiff alleges the refusal of Hudson to renew the other's franchise, and both allege that as a result of the refusal of Hudson to renew plaintiffs' franchises, Bankert has a "virtual monopoly" of the sale of new Hudson automobiles and Hudson automobile parts and accessories in the City of Baltimore, and has arbitrarily fixed the price offered for trade-ins at prices lower than the true competitive prices thereof, and thus has obtained abnormally large non-competitive profits on such trade-ins.

Both complaints allege that as a result of the combination, conspiracy and "virtual monopoly", the public has been injured, in that: (a) in 1952 fewer automobiles moved in interstate commerce into the State of Maryland than would otherwise have moved; in support of this contention it is alleged that Hudson refused to accept orders for 357 automobiles in accordance with plaintiffs' quotas; it is alleged on information and belief that these automobiles were not otherwise sold in Maryland, and plaintiffs believe that but for the conspiracy they could have sold even more Hudsons; (b) during the first five months of 1953 the registrations of New Hudson automobiles in the City of Baltimore were less by 95 than such registrations for the comparable period of 1952; this reduction was much greater than the average for 32 states for the 12 months ending May 31, 1953; and it is concluded that the difference between the 1952 registrations and 1953 registrations, together with additional new Hudson automobiles, would have been sold in the Baltimore area had the plaintiffs still been operating as Hudson agents; (c) higher acquisition prices, i. e. the retail prices of new Hudson automobiles less the used Hudson automobile trade-in allowances, have been paid, are being paid and will be paid to Bankert by the public; (d) and higher prices have been, are being and will be charged for Hudson parts, accessories and service, and the service is less efficiently performed and may only be obtained at a less convenient source and from less efficient personnel than was the case prior to the consummation of the unlawful conspiracy and combination and virtual monopoly.

The complaints allege that plaintiffs have been damaged in the "actual" amounts of $419,064.71 and $717,698.16 respectively, and claim treble those amounts, with costs and attorneys' fees.

Plaintiffs have thus alleged facts which would support claims against Hudson for breach of contract and which might support claims against Bankert for tortious interference with contract rights. But plaintiffs' counsel stated in open court that plaintiffs are not pressing any such claims in these cases, which are based solely on the claimed violations of the anti-trust laws. Moreover, there is no diversity of citizenship between either plaintiff and Bankert.

It is not alleged in the complaints, but it was stated without denial at the hearing, that in 1951 and 1952 there were two other Hudson dealers in the Baltimore metropolitan area in addition to Schwing, Belair Road Hudson, and Bankert: one in Dundalk, in southeast Baltimore, the other in Catonsville, over the city line to the southwest. Plaintiffs concede that there are many dealers for other makes of automobiles in all parts of the city and the Metropolitan area. Plaintiffs do not contend that either Bankert or Hudson held a dominant position in the manufacture or sale of automobiles in Baltimore or anywhere else. Only a "virtual monopoly" in the sale of new Hudson automobiles and Hudson parts and accessories in Baltimore is alleged.

### Discussion

The general principles which control these cases have been frequently stated, and may be briefly summarized. Every manufacturer has a natural and complete monopoly of his particular product, especially when sold under his own private brand or trade name. Arthur v. Kraft-Phenix Cheese Corp., D.C.Md., 26 F.Supp. 824, 828. If he is engaged in a private business, he is free to exploit this monopoly by selling his product directly to the ultimate consumer or through one or more distributors or dealers, as he may deem most profitable to him. If he chooses the latter method, he may exercise his own independent discretion as to the parties with whom he will deal. This is a common law right which the anti-trust laws have not destroyed. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448; Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.

S.Ct. 872, 97 L.Ed. 1277; Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46, 49. A refusal to deal becomes illegal only when it produces an unreasonable restraint of trade or a monopoly forbidden by the anti-trust laws. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162.

■■ A manufacturer may prefer to deal with one person rather than another, and may grant exclusive contracts in a particular territory. Windsor Theatre Co. v. Walbrook Amusement Co., 4 Cir., 189 F.2d 797. Unless his contract so provides, a dealer once appointed has no tenure, no right to a renewal of his contract. Ford Motor Co. v. Kirkmyer Motor Co., 4 Cir., 65 F.2d 1001; Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268, certiorari denied 348 U.S. 821, 75 S.Ct. 34, 99 L.Ed. 648.

■■ An exclusive agency or dealership necessarily involves a limited monopoly to sell the product of the manufacturer in the area covered by the exclusive agreement. Such limited monopolies are not invalid, Windsor Theatre Co. v. Walbrook Amusement Co., supra; Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99, unless they are used to violate the anti-trust laws. They may not be used to extend the producers' monopoly into other fields, e. g. the financing of General Motors automobiles, United States v. General Motors Corporation, 7 Cir., 121 F.2d 376; Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534, modifying 7 Cir., 181 F.2d 70. Nor may they be used to establish market dominance and drive out the products of competitors. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. But the mere fact that such an agreement necessarily gives the dealer a monopoly in handling the product of the particular manufacturer in a given area, and thereby enables the dealer to dictate the price at which the products of that manufac-

turer shall be sold in that area, subject to competition with the products of other manufacturers, does not condemn such agreements; otherwise all exclusive agency agreements would be illegal per se. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311; Windsor Theatre Co. v. Walbrook Amusement Co., 4 Cir., 189 F.2d 797; Arthur v. Kraft-Phenix Cheese Corp., D.C.Md., 26 F.Supp. 824.

■ The main purpose of the anti-trust laws is to protect the public from monopolies and restraints of trade, and the individual right of action for treble damages is incidental and subordinate to that main purpose. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 174, 35 S.Ct. 398, 59 L.Ed. 520; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885, 889. Public injury alone justifies the threefold increase in damages. It is essential, therefore, that the complaint allege facts from which it can be determined that the conduct charged to be in violation of the anti-trust laws was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311; Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885; Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99; Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 214 F.2d 891, 893; Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268; Boro Hall Corp. v. General Motors Corp., 2 Cir., 124 F.2d 822; Feddersen Motors v. Ward, 10 Cir., 180 F.2d 519; Riedley v. Hudson Motor Car Co., D.C. W.D.Ky., 82 F.Supp. 8.

In an effort to meet the requirements of these cases, plaintiffs have claimed in their amended complaints that as a result of the alleged combination and conspiracy and virtual monopoly, the public in the Baltimore area and in the State of Maryland has been injured and damaged in a number of ways.

Subparagraph 10(A) of each complaint alleges that during the year 1952 fewer Hudson automobiles moved in interstate commerce into the State of Maryland than would have so moved if there had been no such combination and conspiracy, and in particular, that Hudson refused to accept orders for some 357 new Hudson automobiles from the plaintiffs in accordance with their respective quotas. It is further alleged, on information and belief, that the 357 Hudson automobiles were not otherwise sold in the State of Maryland, from which plaintiffs draw the conclusion that 357 new Hudson automobiles did not move in interstate commerce into the State of Maryland which but for said conspiracy and combination would have so moved. There is no allegation that Hudson did not ship to plaintiffs and to its other dealers in 1952 a sufficient number of automobiles to supply all persons in the City of Baltimore and elsewhere in the State of Maryland who wished to buy Hudson automobiles. There is no allegation that there was any dearth in the supply of automobiles in general, or of Hudson automobiles in particular. It is not alleged that the public could not have bought as many Hudson automobiles as it wished either from Bankert or from the two other Hudson dealers in the Baltimore metropolitan area. The allegation, on information and belief, that the 357 automobiles were not otherwise sold, and that "it is believed" that an even greater number could have been sold had it not been for the alleged conspiracy, does not show that in 1952 the public was unable to buy at competitive prices all of the automobiles that it wished to buy, or even that it was unable to buy at competitive prices all of the Hudson automobiles that it wished to buy.

Subparagraph 10(B) alleges that the registration of new Hudsons in Baltimore City declined approximately 36% during the five month period from January 1, 1953, to May 31, 1953, as a result of the unlawful combination and conspiracy. Plaintiffs compare this decline with a decline of less than 1% in an average of thirty-two states during the twelve month period from May 31, 1952, to May 31, 1953. Several doubts immediately arise. The two periods are not comparable. The figures show merely that for one reason or another the Maryland public purchased fewer Hudson automobiles. The decrease may well have been due to competition with other makes, which continued unabated. It is hard to understand why Hudson should have conspired with anybody to sell fewer Hudson automobiles. But assuming that the decrease in sales was the result of the conspiracy, it does not follow that the public was injured, or that there was any such restraint of trade as is forbidden by the anti-trust laws. In Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, there is a full discussion of the purpose of the act and the history of the cases construing it. See particularly pages 495, et seq of 310 U.S., page 993 of 60 S.Ct. One of the grounds of decision in the Apex case was that the public was not injured by the fact that 1,000 dozen pairs of Apex stockings failed to move in interstate commerce, because the conspiracy had no effect on the market of the general commodity, and did not give the conspiring group the power to fix prices, restrict production, or lessen quality with impunity, inasmuch as the general market remained in its normal competitive state. So, in the case at bar, the public was not injured by the alleged fact that 357 Hudson automobiles failed to move in interstate commerce, since the market in the general commodity, automobiles in all price ranges, remained in its normal competitive state. The Apex case emphasized market control as a prerequisite for violation of the Sherman Act. See also Appalachian Coals, Inc., v. United States, 288 U.S. 344, 360, 53 S.Ct. 471, 77 L.Ed. 825; United States v. International Harvester Co., 274 U.S. 693, 704, 47 S.Ct. 748, 71 L.Ed. 1302.

The distinction between restraints which produce an effect upon the market in a commodity generally and those restraints which affect a relatively minor

brand in a highly competitive market of the general commodity was recognized by Judge Chesnut in Arthur v. Kraft-Phenix Cheese Corp., D.C., 26 F.Supp. 824, 828. In that case the amended declaration alleged that the corporate defendant conspired with one of its dealers to refuse to sell its private brand products to the plaintiff, another dealer, at dealers' discount, unless plaintiff would buy out, or sell out to, the defendant dealer. The court distinguished the case of Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 97, 68 L.Ed. 308, on the ground that the Binderup case involved defendants who controlled the "distribution of *all* films" in the United States, and distinguished Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, on the ground that the monopoly there charged was the monopoly of "the trade in photographic supplies". Judge Chesnut said:

> "These two cases, one illustrating a restraint of trade, and the other a monopoly of trade, are very different from the case as made in the declaration here. The articles of trade here involved are cheeses and mayonnaise of which there is common knowledge that there are many makes and brands on the market. Although the declaration alleges that the defendant corporation is the result of several combinations of other corporations, there is no allegation of any effort or attempt to monopolize the market in cheese or mayonnaise products generally. Nor is there any allegation of any combination or conspiracy between two or more manufacturers of cheese and mayonnaise products to deprive the plaintiff of an opportunity to deal in cheese and mayonnaise of other manufacturers at dealers' customary discounts."

In substantially all of the cases cited by plaintiffs, there was a horizontal conspiracy between competitors. In a few, e. g. United States v. General Motors Corp., 7 Cir., 121 F.2d 376, the case turned on the dominant position of the company in the industry. By no stretch of the imagination could Hudson or Bankert be considered to have dominated the automobile market in Baltimore or anywhere else. It was stated without contradiction at the hearing that Hudson sold about 2% of the automobiles sold in the United States, and that the percentage in the City of Baltimore and the State of Maryland would not be far different.

Subparagraph 10(C) alleges that higher "acquisition prices" (the retail prices of New Hudson automobiles, less the used Hudson automobile trade-in allowances) have been paid, are being paid and will be paid to Bankert by the public. Again it is important to note what is not and could not be alleged. There is no allegation that Bankert refused to accept cash for a new Hudson without demanding a trade-in, or that the cash price of a new Hudson was raised in any manner by Bankert. There is no allegation that Bankert had a "virtual" monopoly, or any other kind of monopoly of the general used car market in the Baltimore area. The owner of an old Hudson could sell it to a used car dealer and buy a new Hudson for cash, or could trade in his old Hudson on a new car of another make. More importantly, the owner of an old Hudson who was not satisfied with Bankert's trade-in offer could go to either or both of the other Hudson dealers in the Baltimore metropolitan area and see what they would offer in trade.

No horizontal conspiracy between competitors, no effort to extend the manufacturer's natural monopoly of its own product, no effort to establish market dominance and drive out the products of competitors is alleged. The absence of such allegations distinguishes the case at bar from all of the cases cited by plaintiffs except one, Webster Motor Car Co. v. Packard Motor Car Co., 135 F.Supp. 4, 8, recently decided by the District Court for the District of Columbia and now on appeal. The facts in that case, as set out in the opinion of Judge Holtzoff, are sim-

ilar to the facts alleged in the amended complaints in our case, except that Packard gave Zell an exclusive contract for the Baltimore area and eliminated all rival dealers. Judge Holtzoff recognized that a business concern has the privilege of selling its products to whomever it chooses, to refrain from dealing with any one, and to prefer one potential customer over another. He said that "if the Packard Motor Car Company of its own initiative, for whatever reasons it deemed best, determined that thereafter there should be only one Packard dealer in Baltimore, who would receive an exclusive franchise, and that this dealer should be the Zell Motor Car Company, there would probably have been no violation of the anti-trust laws." But he said that "the right to select one's customer's is a right that may be exercised free from compulsion and without agreements with others that tend unreasonably to restrain interstate commerce or to create a monopoly. Such a choice may not legally result from an agreement or arrangement or conspiracy between two or more individuals, or two or more business concerns, to exclude others from the channels of trade, or to attempt to create a monopoly or substantial monopoly for one of the parties to the agreement."

That is true if the agreement is a horizontal one between competitors, or if the manufacturer dominates the market in the commodity. But it had not theretofore been held to be true where the agreement was between a comparatively small manufacturer in a highly competitive field and a local dealer whom the manufacturer wished to secure or retain. Hudson Sales Corp. v. Waldrip, supra; Feddersen Motors v. Ward, supra. The question, of course, is what agreements tend "unreasonably" to restrain interstate commerce, and whether the "monopoly" is a true monopoly of a commodity, or merely the natural and proper monopoly which every manufacturer has of his own product in a highly competitive market.

Judge Chesnut recognized this distinction in Arthur v. Kraft-Phenix Cheese Corp., supra, as did the Seventh Circuit in the General Motors case, where they said:

"* * * For that matter GMC has always dominated the market for General Motors cars to a considerable extent, but it was only when control of the marketing process was perfected by the appellants and was directed at the creation of an artificial non-competitive market for GMAC, that it extended beyond legitimate business demands and became a meance to the interests of the public." 121 F.2d at page 403.

Judge Holtzoff concluded in the Packard case that the jury "had a right to reach the conclusion that an agreement on the part of the manufacturer with one of its own dealers to terminate the franchise of all competitors and to grant to him a monopoly within a certain area, is an agreement in unreasonable restraint of trade, or an agreement to monopolize." But it must be recognized that a manufacturer would not decide to reduce the number of its dealers in a particular city from 5 to 3 or from 2 to 1 without discussing the matter with the dealers or dealer whom it wished to retain. Such decisions are not made in a vacuum. To say that a manufacturer may legally decide to reduce the number of its dealers in a given area if it does not discuss the matter with the dealers beforehand, but violates the anti-trust laws if it does discuss the matter with them before the new agreements are made, ignores the realities. Of course the agreement would be invalid if it was the result of some horizontal arrangement between competitors, or if there was any agreement which tended unreasonably to restrain interstate commerce or to create a monopoly. But a monopoly in that sense would have to be a real monopoly in the commodity and not the natural monopoly which a manufacturer has in his own product. Unless the manufacturer dominates the market, he has a right to give a dealer an actual monopoly, let alone a "virtual" monopoly, in the sale of his particular make or brand in a particular territory.

And this right is not to be lost simply because the manufacturer and the dealers discuss the matter before the expiring agency or dealership agreements terminate and are not renewed. The conclusion reached by Judge Holtzoff is in conflict with the conclusion reached by Judge Chesnut in Arthur v. Kraft-Phenix Cheese Corp., D.C., 26 F.Supp. 824. It seems to me that Judge Chesnut's rule is the sounder rule, more in accord with the doctrine of the cases cited above.

If the plaintiffs' contention were correct, it is hard to see how Hudson could ever reduce the number of its dealers in any given area after discussing the matter with the dealers involved, since the remaining dealers, whether one or two or three, would have a "virtual monopoly" of the sale of new Hudson automobiles in the area.

Subparagraphs 10(D) and 10(E) allege that higher prices and charges have been, are being and will be charged by Bankert for supplying Hudson parts, accessories and Hudson service, and that such "authorized" service is less efficiently performed and may only be obtained at a less convenient source and from less efficient personnel than was the case prior to the consummation of the alleged conspiracy, combination and virtual monopoly. Once again, we must note what is not and presumably could not be alleged. It is not alleged that Bankert had any monopoly, virtual or otherwise, in the supplying of Hudson automobile parts, accessories and service. It is not alleged that Hudson would not sell Hudson parts to any repairman at the same price it sold them to Bankert and the other two Hudson dealers in the Baltimore area. The question of convenience is relative. Bankert's establishment at 25th and Howard Streets is more centrally located than the establishment of either of plaintiffs. Each location would be more convenient for some people and less convenient for others. Such matters do not come within the purpose of the Sherman Act. Boro Hall Corp. v. General Motors Corp., 2 Cir., 124 F.2d 822; Lawson v. Woodmere, 4 Cir., 217 F.2d 148. "In the classic cases of Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 648, 55 L.Ed. 663; the Supreme Court established the celebrated 'rule of reason' by holding that not all restraints of interstate commerce are within the ambit of the Sherman Anti-Trust Act, but only those restraints which are undue or unreasonable. The Act does not cover restraints that are merely incidental, casual and immaterial." Lawson v. Woodmere, supra, 217 F.2d at page 151.

█ I conclude that the amended complaints do not show any unreasonable restraint of interstate commerce nor any monopoly forbidden by the anti-trust laws nor any injury to the public sufficient to support an action for treble damages under the Clayton Act. In the Kraft-Phenix case, Judge Chesnut said:

> "It is not generally desirable to decide cases of doubtful import on the pleadings only as by demurrer. But suits of this character involving alleged conspiracies to monopolize or restrain trade often lead to very protracted trials and it is not reasonable to subject either or both parties to the expense of a long trial when it fairly appears with reasonable clarity from the declaration that conceding all the facts therein well pleaded, there would have to be a directed verdict against the plaintiff; especially where, as here, we are dealing with a declaration which has been amended after full argument and considered opinion on the original declaration."

The motions to dismiss the amended complaints are hereby granted.