QUALITY MERCURY, INC., Appellant,

v.

FORD MOTOR COMPANY et al., Appellees.

Nos. 75–1489, 75–1602.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1976.

Decided Sept. 27, 1976.

Charles A. Cox, Minneapolis, Minn., for appellant; Michael J. Hoover, Minneapolis, Minn., on the brief.

Henry Halladay, Minneapolis, Minn., for appellees Ford Motor Co. and Ford Marketing Corp. Lynn Krominga, Minneapolis, Minn., on the brief.

Harold D. Field, Jr., Minneapolis, Minn., for appellees Prestige Lincoln-Mercury, Inc., N. Grossman and H. I. Grossman; Charles A. Mays, Minneapolis, Minn., on the brief.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

Quality Mercury, Inc. appeals from the district court's grant of judgment on the pleadings in favor of the defendants pursuant to Fed.R.Civ.P. 12(c).

The pleaded facts may be summarized as follows. Quality is an automobile dealer in Bloomington, Minnesota, a suburb of Minneapolis. It sells Mercury automobiles, which are manufactured by defendant Ford Motor Co. and marketed by the Lincoln-Mercury division of defendant Ford Marketing Corp. Under an agreement with Quality, Lincoln-Mercury may franchise another Mercury dealer only if the other dealer's place of business is more than ten miles from Quality's.

Defendant Prestige Lincoln-Mercury, operated by defendants N. Grossman and H. I. Grossman, sells Mercury and Lincoln automobiles in St. Louis Park, Minnesota, within the Minneapolis area but more than ten miles from Quality.

Quality, which has not been franchised to sell Lincolns, contends that no franchise has been allowed because in 1962, before Quality was in existence, Ford bound itself not to create another Lincoln dealership in the Minneapolis area without Prestige's consent. Quality contends that this in effect grants Prestige a contract in perpetuity and unlawfully prevents Ford from awarding Quality a Lincoln dealership.

Quality asserts further that this agreement is an unlawful combination and conspiracy to restrain trade in violation of § 1 of the Sherman Act. As a result Quality contends it has been damaged, and "the public has and will continue to be injured by being deprived of a needed Lincoln outlet for sales, leasing and service in a large and significant trade area and the benefits of competition that would result from such an outlet." Quality prays for treble damages and injunctive relief.

The Prestige defendants (Prestige and the two Grossmans) filed an answer denying many of Quality's allegations. They admitted that, to induce the Grossmans to operate a Lincoln dealership, Ford promised not to open any Lincoln dealerships in Minneapolis for two years, and thereafter to do so only if "Lincoln penetration of Price Class in Minneapolis locality is less than District Average."[1] In fact, Prestige asserts, Ford allowed two Lincoln dealerships in the Minneapolis area after it franchised Prestige. The Ford defendants filed a separate answer, substantially denying all of the allegations of the complaint.

Prestige and Ford both moved for judgment on the pleadings. Their motions were granted and Quality has appealed.

## I.

Section 1 of the Sherman Act, 15 U.S.C. § 1, reads, in part, as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

In *Northern Pacific Ry. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the Supreme Court discussed the general purpose of the antitrust laws:

The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.

*Id.* at 4, 78 S.Ct. at 517.

We must construe all well pleaded factual allegations of the complaint as true and draw in favor of Quality all reasonable inferences and intendments from these facts. *See National Metropolitan Bank v. United States,* 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383 (1945). In so construing the complaint, we find it alleges that Ford and Prestige have bound themselves to an arrangement whereby a horizontal competitor (Prestige) has a perpetual veto power over all applications for Lincoln franchises in the Minneapolis area, thus interfering with the "unrestrained interaction of competitive forces" in the Minneapolis automobile market.

With this construction of the complaint we must decide whether the plaintiff has stated a proper claim for relief under the antitrust laws.

---

1. There is a conflict between the parties as to the character of the Ford obligation to refrain from creating another Lincoln dealership in the area. Quality has taken the position, emphasized strongly on appeal, that Ford agreed never to grant another Lincoln franchise in the area. Ford contends, in contrast, that the restriction was as indicated in the text.

■ Our initial inquiry is whether plaintiff has alleged, under § 1 of the Sherman Act, a "contract, combination . . . or conspiracy" in restraint of trade. If Ford's refusal to deal with Quality was merely a unilateral or independent decision there would be no such contract. *See United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). However, if more than mere unilateral action was involved, then Ford has created a combination. *See Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); and *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

■ In order for Quality to show a "contract, combination . . . or conspiracy," it was not necessary to plead a formal agreement between Ford and Prestige. An allegation that their conduct was "joint or collaborative" was sufficient. *See United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Reed Brothers, Inc. v. Monsanto Co.,* 525 F.2d 486 (8th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976); *American Motors Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230 (3d Cir. 1975); and *Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874 (1st Cir. 1966). *Cf. United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 391 n. 12, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) (Stewart, J., dissenting). Thus, whether an unlawful combination or conspiracy existed was to be judged by Ford's and Prestige's words and actions and not by the terms of the agreement. *See United States v. Parke, Davis & Co., supra*; and *American Holiday Inns, Inc. v. Holiday Inns, Inc.,* 365 F.Supp. 1073, 1090 (D.N.J.1973), *aff'd in part,* 521 F.2d 1230 (3d Cir. 1975). Accepting Quality's allegations as true and applying the foregoing principles, we conclude that Ford's action in denying Quality's application was not taken unilaterally, but rather "jointly or collaboratively" with its franchisee, Prestige.

■ However, not all "contracts, combinations . . . or conspiracies" in restraint of trade are unlawful. We must therefore determine whether the alleged restraint has some factual underpinning upon which it might be declared unreasonable.[2]

In holding that vertical agreements granting exclusive franchises to dealers were not violative of antitrust laws, the district court relied on several decisions which have held that a manufacturer may terminate a distributorship held by one party and transfer it to another without violating the Sherman Act. Moreover, the manufacturer may consult with the new distributor, and, prior to termination of the old distributor, reach agreement with him about the termination and transfer. *See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) and cases there cited; *Packard Motor Car Co. v. Webster Motor Car Co.,* 100 U.S.App.D.C. 161, 243 F.2d 418 (1957); *Schwing Motor Co. v. Hudson Sales Corp.,* 138 F.Supp. 899 (D.Md.), *aff'd,* 239 F.2d 176 (4th Cir. 1956), *cert. denied,* 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957). The essential reasoned analysis behind these cases is that it is not an *unreasonable* restraint of trade for a franchisor to exercise his independent judgment as to with whom he chooses to deal. As the Supreme Court observed in *United States v. Arnold, Schwinn & Co., supra,* 388 U.S. at 376, 87 S.Ct. at 1864:

> [A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods. *Cf. United States v. Colgate & Co.,* 250 U.S. 300, [39 S.Ct. 465, 63 L.Ed. 992] (1919). If the restraint stops at that point—if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and

2. Quality does not contend that the defendants conduct is a *per se* violation of § 1 of the Sherman Act. Therefore our inquiry is whether the alleged restraint is unlawful under the rule of reason.

if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act.

Most of the decisions dealing with further restraints, the issue left unanswered by *Schwinn,* have dealt with terminations or cancellations of dealers by a manufacturer pursuant to an agreement with either a competing or succeeding dealer. In *Schwing Motor Co. v. Hudson Sales Corp., supra,* and *Packard Motor Car Co. v. Webster Motor Car Co., supra,* manufacturers terminated dealerships pursuant to an agreement or understanding with a competing dealer. Both courts held that a manufacturer has a right to select his customers and may agree with one to exclude another, if: (1) the agreement is not a horizontal one between competitors; (2) the manufacturer is not using it to establish market dominance; or (3) the manufacturer is not using it to promote a monopoly.

The *Packard* decision was not unanimous. In his dissent Judge Bazelon emphasized that there was substantial evidence to support the jury's verdict that the cancellation was not a unilateral decision by the manufacturer, but rather resulted from an agreement between the manufacturer and a dealer to eliminate the competing dealers. Judge Bazelon criticized the *Schwing* decision for its restrictive view of the unreasonableness of vertical restraints:

> [That] case would limit the manufacturer's right to select his own customers by the requirement that he make no agreement with one to exclude another. *Schwing* would recognize this limitation only "if the agreement is a horizontal one

between competitors, or if the manufacturer dominates the market in the commodity." 138 F.Supp. at page 906. In this I think *Schwing* is wrong. The Supreme Court has held that, even apart from monopolistic effect, a *vertical* agreement which excludes a competitor of one of the parties from a substantial market violates § 1 of the Sherman Act. 243 F.2d at 422.[3]

In *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), the Ninth Circuit drew the proper line in determining the reasonableness of vertical restraints. The court observed that the determination of the reasonableness of vertical combinations or conspiracies in restraint of trade should focus on whether its purpose or effect was anticompetitive.[4] We agree with this analysis early supported by Judge Bazelon's dissent.

Quality's complaint alleges that there was no valid business reason for the denial of a new Lincoln dealership in the Minneapolis area. We find this absence, when combined with the allegation that Prestige, a horizontal competitor, could in its sole discretion determine if the Minneapolis market was to be serviced by another Lincoln dealership, renders reasonable the inference of an anticompetitive motive or effect.

The unreasonable character of agreements allowing horizontal competitors to exercise in effect a veto power over a new franchise application was considered in *United States v. Topco Assoc., Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); and *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230 (3d Cir.

---

**3.** Despite Judge Bazelon's dissent, the *Packard* and *Schwing* decisions have been cited as precedent for the proposition that an exclusive franchise is valid as long as it does not constitute a horizontal conspiracy or monopoly. However, in *White Motor Co. v. United States,* 372 U.S. 253, 269 n. 8, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), Justice Brennan, concurring, commented that *Packard* and *Schwing* were of limited scope since both Packard and Hudson were small car manufacturers and needed the exclusions in order to enhance their positions in competition with the large automakers. *See*

also, *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir. 1963); and *Top-All Varieties, Inc. v. Hallmark Cards, Inc.,* 301 F.Supp. 703 (S.D.N.Y.1969).

**4.** In applying this test the court found no violation of the Act since the combination was found to be the result of a legitimate business interest of the manufacturer in "the quality, competence and stability of his distributors." *Id.* at 80. In addition, we note that *Seagram* dealt with the application of a *per se* rule, while our inquiry proceeds under the rule of reason.

1975). In the latter case, AMI's application for a Holiday Inn franchise at the Newark Airport was rejected. In considering the application, Holiday mailed written notices of the application to the three Holiday Inn franchises nearest the airport site. These "radius letters" were standard procedure in reviewing applications. The trial court found that a negative response by an existing franchisee was treated as a veto over the application. On appeal Judge Adams said:

> By thus permitting its existing franchisees to determine whether a potential competitor would be allowed to enter the Elizabeth-Newark market, HI enabled its franchisees already in the Elizabeth-Newark area to divide that market between themselves, thus precluding further in-

trabrand competition. Such conduct constitutes a horizontal market allocation that is a violation of the Sherman Act. *Id.* at 1242.[5]

In addition to the granting of sole discretion to a *horizontal competitor* as to the entry of another dealership in the Minneapolis area, we find the *character and nature* of this discretionary power an integral aspect in our analysis. A fair construction of Quality's pleadings is that Ford and Prestige violated the Sherman Act by agreeing to an exclusive franchise in *perpetuity*. The granting of a perpetual exclusive franchise is suspect under the Sherman Act, because changes in conditions, unforeseen when the exclusive franchise was granted, may combine to create an anticompetitive effect.[6] Moreover, the suspicion of the per-

---

**5.** *Holiday Inn* may, of course, be distinguished on its facts. The franchisees in *Holiday Inn* did not possess exclusive franchises. Also the combination was between two or more horizontal competitors and the franchisor, while here the alleged combination was between one horizontal competitor and the franchisor. But we do not consider these differences critical. While the presence of a horizontal conspiracy would render the restraint a *per se* violation of § 1, the absence of a horizontal conspiracy does not automatically render the restraint reasonable. A purely vertical agreement can be an unreasonable restraint in violation of § 1 of the Sherman Act. *See Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

**6.** While there are no decisions finding a Sherman Act violation in a case such as this, persuasive suggestions have been made that such a finding might be proper. *See* Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 704 (1962); Note, *Restricted Channels of Distribution Under the Sherman Act,* 75 Harv.L.Rev. 795 (1962). The position is taken that when a manufacturer goes beyond the simple grant of a franchise and promises an exclusive franchise lasting for some time into the future, its action becomes suspect. A cogent economic analysis is made in the Harvard note:

> When by unilateral decision a manufacturer has appointed only one outlet in a particular area, three principal forces operate to limit the price charged by the outlet for the

manufacturer's product. The first is the possibility of interbrand competition. The second is the possibility of intrabrand competition from fellow dealers or distributors outside the outlet's territory; this check will come into play when the outlet's price becomes sufficiently high to overcome the barriers of interterritorial cost that normally serve to keep customers and sellers in their own areas. The third is the possibility of intrabrand competition from within the outlet's own area should the manufacturer decide either to sell there directly or appoint another outlet. The anticompetitive effect of the exclusive franchise lies in its elimination of the last check. Whatever the strength of the other two competitive forces, the dealer or distributor would hardly have sought the exclusive if it did not confer some measure of protection from competition. And when the outlet occupies an entrenched position in the local market—owing to an ideal location, possession of the best retail accounts, or simply status as the sole dealer or distributor of such products in the area—the exclusive may serve to confirm a substantial amount of monopoly power in the outlet. The anticompetitive effect may be aggravated by factors unforeseen when the exclusive was granted. A population influx or change in buying habits may create an increased demand, which in the absence of the exclusive might well lead the manufacturer to establish a second outlet in the area. The exclusive outlet may be content to benefit from the changed conditions by raising price rather than increasing volume.

> *In view of the potentially significant anticompetitive effect, it is proper to demand a convincing justification for the manufactur-*

petual exclusive franchise is intensified in this case by Quality's additional allegation that there were no valid business reasons for the denial of a new Lincoln dealership in the Minneapolis area.

Under these circumstances this case should not have been dismissed by a judgment on the pleadings, and Quality should have been allowed an opportunity to prove the unreasonableness of the restraint.

## II.

■ As an alternative basis for its judgment, the district court held that the complaint was deficient for failing to contain sufficient allegations of public injury. An antitrust complaint must "allege facts from which it can be determined that the conduct charged to be in violation of the antitrust laws was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce." *Kinnear-Weed Corp. v. Humble Oil & Refining Co.,* 214 F.2d 891, 894 (5th Cir. 1954). However, in determining whether Quality's complaint has satisfied this standard, we are guided by Fed.R.Civ.P. 8(f) which requires us to construe the pleadings to do substantial justice. This principle of construction is particularly appropriate in antitrust cases as was recently observed by the Supreme Court:

> We have held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957) (footnote omitted). And in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," *Poller v. Columbia Broadcasting System Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

*Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

■ The complaint alleged "the public had and will continue to be injured by being deprived of the needed Lincoln outlet for sales, leasing and service in a large and significant trade area and the benefits of competition that would result from such an outlet." We deem this language sufficient. The purpose of the Sherman Act is the elimination of restrictions on competition. This paragraph alleges that, but for the illegal restraint, there would be competition in the sale, leasing and service of Lincoln automobiles from which the public would benefit. This allegation could be made more specific only by alleging in detail the specific probable effects of increased competition (*e. g.,* reduced prices, improved service). But such detail in pleading is not required under the federal rules, even in an antitrust case. *See* Wright & Miller, *Federal Practice and Procedure* § 1228 (1969).

Judgment reversed and remanded to the district court for further proceedings.

---

*er's going beyond a unilateral decision and binding himself by the promise of an exclusive*

*franchise.* 75 Harv.L.Rev. at 824–25 (emphasis added).