**MILLER MOTORS, Incorporated, Plaintiff,**

v.

**FORD MOTOR COMPANY, a Corporation, Defendant.**

**Civ. No. 563.**

United States District Court
M. D. North Carolina,
Winston-Salem Division.
March 20, 1957.

Elledge & Johnson, Clyde C. Randolph, Jr., and H. Bryce Parker, Winston-Salem, N. C., for plaintiff.

Womble, Carlyle, Sandridge & Rice, W. P. Sandridge and W. F. Womble, Winston-Salem, N. C., for defendant.

THOMSEN, District Judge, sitting by designation.

This is an action for treble damages under the antitrust laws brought against Ford Motor Company by a former Lincoln-Mercury dealer at Winston-Salem, N. C. No claim is made based upon any breach of contract or other cause of action except the alleged violation of the antitrust laws.

The complaint is elaborate and was amended twice before trial; so amended, it sets up six causes of action, alleges that all acts complained of in the several causes of action were done in furtherance of the conspiracy alleged in the first cause of action, and that the acts alleged in each cause of action violated Secs. 1 and 2 of the Sherman Act and Secs. 3[1] and 4 of the Clayton Act, 15 U.S.C.A. §§ 1, 2, 14, 15.

The first cause of action alleges that Ford entered into an arrangement with the several Lincoln-Mercury Dealers Advertising Funds (LMDAs) throughout the country, under which Ford collected from each dealer the assessments made by the LMDA to which such dealer belonged, and turned the money over to that LMDA, to be spent by it for advertising in the name of the individual dealer or of Lincoln-Mercury dealers generally. The question is whether that arrangement was either (a) a conspiracy

---

1. The second cause of action does not charge a violation of Sec. 3 of the Clayton Act.

which unreasonably burdened the interstate commerce in Lincoln-Mercury automobiles or the advertising thereof, in violation of Sec. 1 of the Sherman Act, or (b) an attempt to monopolize the commerce in such automobiles or the advertising thereof, in violation of Sec. 2 of the Sherman Act, or (c) a tie-in of the sale of advertising with the sale of automobiles, in violation of Sec. 3 of the Clayton Act.

The second cause of action alleges that Ford shipped to plaintiff many defective automobiles, required plaintiff to fix them, and refused to pay plaintiff's regular and customary charges for this type of work; that plaintiff did the work under duress, and because of the low rates allowed by Ford, frequently lost money on such repairs. On defendant's motion for summary judgment, I ruled that the second cause of action did not state a separate claim under the antitrust laws, but that plaintiff might offer evidence of the facts alleged therein, as means claimed to have been used to enforce the conspiracy alleged in the first cause of action and to effectuate the domination alleged in the fifth.

The third cause of action alleges that Ford discriminated against plaintiff by not giving plaintiff its proportionate number of cars at the beginning of new model years, but after automobiles became plentiful insisting that plaintiff accept and sell more automobiles than its territory would absorb; that this alleged discrimination was practiced against plaintiff because plaintiff would not submit to all of Ford's demands. At the end of plaintiff's case, its counsel conceded that it was not entitled to recover under the third cause of action as a separate claim, but argued that the evidence offered in support thereof should be considered in connection with plaintiff's claim that Ford dominated plaintiff's business.

The fourth cause of action deals with parts and accessories; it alleges that "defendant required the plaintiff wilfully, unlawfully and under duress to accept tie-in sales, and * * * to buy exclusively from the defendant, * * * in order to obtain automobiles from the defendant each model year." The issue is whether Ford's insistence that its dealers purchase and carry parts and accessories manufactured by or for it was so great and of such nature that it violated Sec. 3 of the Clayton Act.

The fifth cause of action alleges that "defendant wilfully, unlawfully and maliciously dominated and monopolized the * * * business of the plaintiff by holding a leaver (sic) over the head of the plaintiff due to the fact that the defendant had the exclusive sale and manufacture of Lincoln-Mercury automobiles." Violation of Sec. 2 of the Sherman Act is claimed.

The sixth cause of action alleges that Ford, in conspiracy with LMDA, cancelled plaintiff's sales agreements, because of plaintiff's unwillingness to do the various things Ford insisted upon, as set out in the first five causes of action. At the end of plaintiff's case, its counsel conceded that it was not entitled to recover under the sixth cause of action as a separate claim, but argued that the evidence offered in support thereof should be considered in connection with plaintiff's claims of conspiracy, domination and monopolization.

In connection with each cause of action which is being pressed, the question arises whether plaintiff proved any damages resulting from alleged violations which occurred within the applicable period of limitations.

### Limitations.

The original complaint in this case was filed on July 29, 1955. The new Federal statute of limitations, 15 U.S. C.A. § 15b, for claims under secs. 15 and 15a, did not become effective until January 7, 1956, and provided that it should not revive any cause of action theretofore barred under existing law. It had been repeatedly held that 28 U.S. C.A. § 2462, R.S. § 1047, was not applicable to actions under 15 U.S.C.A. § 15, but that the court should apply the statutes of limitations of the state in which

the action was commenced. Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885.

Defendant contends that this action is barred by Sec. 1–54(2) of the General Statutes of North Carolina, which imposes a one year limitation on any action "upon a statute, for a penalty or forfeiture, where the action is given to the State alone, or in whole or in part to the party aggrieved, or to a common informer, except where the statute imposing it prescribes a different limitation". Failing this, defendant falls back upon sec. 1–52(2), which imposes a three year limitation on any action "upon a liability created by statute, other than a penalty or forfeiture, unless some other time is mentioned in the statute creating it."

■ It is not clear which of these two sections governs actions under the antitrust laws. It is clear, however, that in such a case as this, the sources of damage are separable for purposes of limitations. Emich Motors Corp. v. General Motors Corp., 7 Cir., 229 F.2d 714, and cases cited. It is also clear that plaintiff has not alleged or proved any such duress as would toll the statute, assuming it could be tolled by duress. To constitute duress, the threatened action must be unlawful. 54 C.J.S., Limitations of Actions, § 197, p. 201. A threat to do what one has a legal right to do cannot constitute duress. Kirby v. Reynolds, 212 N.C. 271, 282, 193 S.E. 412, and cases cited. The alleged duress consisted of threats by Ford to terminate plaintiff's dealership, which Ford had the clear right to do. Ford Motor Co. v. Kirkmyer Motor Co., 4 Cir., 65 F.2d 1001. So, at a pretrial hearing, although withholding decision on the question of which section applies, I did rule: (a) that evidence with respect to damages should be limited to damages resulting from alleged violations of the antitrust laws during the period of three years before suit, and should also show what part of the damages so claimed were caused by alleged violations during the last year; and (b)

that evidence of defendant's acts and conduct beyond the period of three years might be offered to prove a conspiracy, a course of dealing or other conduct relevant and material to any of the issues in the case.

## Facts.

After oral argument, I dictated into the record rulings on many proposed findings of fact submitted by the respective parties; the following narrative statement, however, gives all the facts necessary to an understanding of the issues.

## The Industry.

The evidence in this case, like that given before the Congressional Committees in 1956, supports the following statement, which is quoted from the Report of the Senate Judiciary Committee, 84th Cong., 2d Sess., Rep.No. 2073. "The evidence indicated that great pressure had been exerted, at least by the dominant automobile manufacturers, upon dealers to accept automobiles, parts, accessories, and supplies which they did not need, did not want, or did not feel their market was able to absorb. * * * dealer witnesses asserted that while they were ostensibly independent businessmen, the factory dominated and controlled almost every phase of their operations at all times. The conflict in interest between factory and dealer is a conflict between parties of totally unequal economic power. Automobile production is one of the most highly concentrated industries in the United States * * *. Today there exist only 5 passenger-car manufacturers, 3 of which produce in excess of 95 percent of all passenger cars sold in the United States. There are approximately 40,000 franchised automobile dealers distributing to the public cars produced by these manufacturers. Dealers have an average investment of about $100,000. This vast disparity in economic power and bargaining strength has enabled the factory to determine arbitrarily the rules by which the two parties conduct their business affairs. These rules are incorporated in the sales agreement or franchise which the manu-

facturer has prepared for the dealer's signature. Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer. The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facilities to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty of obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for domination by the factory. * * * The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer. This economic strength manifests itself in two principal ways: (1) Control and supervision of the dealer's business. (2) Power to terminate or to refuse to renew the dealer's franchise. The threat of termination which the manufacturer holds over the dealer once the dealer commits himself to the requirements for entry into the industry permits the manufacturer to control the dealer and his operation. The dealer accepts this relationship in the expectation that it will be profitable. He later can reconsider his decision only with the knowledge that his business is specialized in nature and his capital not readily transferable to alternative uses. * * * "

### The Defendant and Its Sales Agreements.

Ford is the second largest producer of passenger automobiles, with assets of some 2½ billion dollars. It produced 22.78% of all new automobiles sold in the United States in 1952, 25.15% in 1953, and 30.84% in 1954. In 1953 it sold 1,443,153 cars, of which about 327,-000 were Lincolns and Mercurys; in 1954 the corresponding figures were 1,-706,617 and 306,000, respectively. It has 8,500 retail distributors, of whom 1,-843 sold Lincolns and Mercurys.

Before 1946, Lincolns and Mercurys were sold by Ford car dealers. In October, 1946, Ford organized the Lincoln-Mercury Division, which is subdivided into regions, districts, and zones, with its own field organization. Winston-Salem is in the Atlanta District, which, in 1950, had been separated from the Jacksonville District, of which it had theretofore been a part.

The field organization serves two principal purposes: (1) obtaining information for the factory, or home office, at Detroit, and (2) helping promote the sale of Lincolns and Mercurys to franchise dealers, and by such dealers to the public. Members of the field organization call on each dealer, suggest how he may improve his operations, and take orders for automobiles, parts and accessories. The methods of car production and distribution are essentially those set out in United States v. General Motors Corp., 7 Cir., 121 F.2d 376, at pages 386 to 388, and need not be detailed here.

Plaintiff, like other dealers, entered into separate but similar sales agreements covering Lincolns and Mercurys. Under these agreements, the dealer is obligated to maintain a place of business located in a place and equipped in a manner acceptable to Ford; to maintain tools, machinery and equipment recommended by Ford; to employ sufficient competent salesmen to solicit adequately all potential purchasers of the division's products in the community; to employ sufficient competent service mechanics to render prompt, efficient service to owners of Lincolns and Mercurys, and to render such service; to install and maintain an accounting system in accordance with a manual approved by Ford; to furnish Ford, at regular intervals, accurate financial statements, reflecting the financial condition of the dealer's business; to make available all records, contracts and accounts for examination by Ford at all reasonable times; to maintain a stock of automobiles, parts and accessories; to have available one or more new automobiles for demonstration purposes; to advertise the use of genuine parts in the repair of Ford's products only where such genuine parts are actually used; to

advertise in no manner or method detrimental to Ford, or to which Ford may object as being detrimental to its name or good will. For its part, Ford agrees that if it terminates the sales agreement, it will re-purchase the dealer's stock, subject to payment of transportation costs by the dealer and certain other conditions. The agreements may be terminated at will by either party, but in case of termination by Ford, sixty days notice must be given. The agreements specify that the dealer is not an agent. Ford expressly reserves the right to refuse to deliver automobiles to the dealer for reasons satisfactory to it, and the agreement expressly provides that Ford shall not be liable for failure to ship or for delay in shipments, however caused.

The agreements provide for a cooperative advertising fund, to which each dealer contributes a certain amount and Ford a smaller amount for each new Lincoln or Mercury purchased by the dealer. The fund so established is controlled by Ford, but each dealer's contributions are spent in his territory. Plaintiff, like other dealers, was required to sign the co-op agreements.

Dealers employ various methods of paying for automobiles, of which the method used by plaintiff is the most common. Plaintiff had an open letter of credit with a finance company. Upon receipt from plaintiff of each order for a certain number of cars, Ford would draw a draft on the finance company, which would pay for each automobile at the time of its delivery to the convoy carrier at the factory. Ford engages the convoy carrier and pays the transportation charges; the dealer pays to Ford a charge for distribution and delivery, which includes an amount equal to railway freight from Wayne County, Michigan, to the dealer's place of business.

Under its "Warranty and Policy Procedure Manual", Ford warrants to the dealer parts of the automobiles for a period of ninety days from the date of original delivery to the ultimate purchaser, or until the vehicle has been driven 4,000 miles, whichever shall first occur.

This warranty applies only to such parts as shall, under normal service, appear to Ford to have been defective in workmanship or material. The dealer makes the same warranty to the purchaser and delivers to him an "Owner's Service Policy", which obligates the dealer to deliver, without charge, replacement parts to which the purchaser is entitled under the terms of the warranty. The Manual sets forth a detailed procedure, under the terms of which Ford repays the dealer for parts used in warranty work and a specified percentage of the dealer's retail labor rate. This payment is intended to cover the dealer's costs, without any allowance for overhead or profit, and, because of specific time allowances for various jobs fixed by the manual, sometimes results in a small profit to the dealer, but more often resulted in a loss to plaintiff. The procedure has been modified from time to time. Unless the required procedure is followed, the dealer may encounter considerable difficulty or delay in securing reimbursement for warranty work done and parts used. Plaintiff consistently failed and refused to fill out the forms properly, and Miller abused Ford's representatives who attempted to show him how to do so.

An "Extended Adjustment Policy" was adopted, effective April 1, 1953, to assist the dealers in promoting customer good will and to protect the reputation of Ford's products.

When the factory turned out an unusually large number of cars with minor defects, as sometimes happened when substantial changes were made in the models, the factory had insufficient "hospital" space for the cars, and sent them on to the dealers in the expectation that the dealer would correct the defects in the "new car get ready" process. This practice cost conscientious dealers money. An inordinate proportion of the expenses of plaintiff's shop was spent on such work; but plaintiff spent considerably less money per car on such work than the average dealer in the district, region or country. The disproportion was principally caused by the lack of

public repair work done by plaintiff at ordinary retail prices, which, in turn, was largely due to the fact that plaintiff did not make sufficient effort to sell shop service to the public.

Plaintiff's Dealership and Its Termination, Including Alleged Domination and Discrimination by Ford.

Plaintiff was incorporated in 1946 as Davis-Miller Motor Company. Miller had been a Ford dealer before the war and was familiar with many of Ford's practices of which he now complains, including the policy requiring a dealer to purchase the number of cars Ford feels the territory should absorb, on pain of losing his franchise. Nevertheless, Miller solicited a Lincoln-Mercury dealership in 1946.

Plaintiff's net worth (original investment plus retained profits) varied considerably during the course of its operations, reaching a high of $133,000 in January, 1953; it was regarded as a large dealer though not a metropolitan dealer.

During the sellers' market following the war, plaintiff's business, like that of most automobile dealers, was very profitable; for the years 1946–1951, its profits totalled $113,733.75, after comfortable salaries to the two principal officers.[2] Thereafter, the business was not profitable; Miller was not capable of meeting the keen and ruthless competition which developed in 1953. His sales managers, parts managers, and service managers were not aggressive. Ford's representatives had frequently urged Miller to hire more forceful persons, and Miller had made a few changes, but not enough to secure an effective organization.

In 1952–53 the market shifted from a sellers' market to a buyers' market; but the automobile companies, particularly General Motors and Ford, seemed determined to sell ever more cars. Substantially increased quotas were presented to plaintiff and other dealers. Ford insisted that its dealers come close to meeting the new quotas if they were to hold their dealerships. In most cases the volume of cars could not be sold in the traditional manner; and the practice of holding blitz sales developed throughout the industry. Officers and employees of the manufacturers encouraged blitz sales, until they recanted during and after the Congressional hearings in 1956. At best, blitz sales meant that a dealer would sell an increased number of cars at a much smaller profit, sometimes at no profit. At worst, blitz advertising was dishonest; prices were padded in order to show apparent reductions in price. Dealers who did not engage in such practices found that their customers complained because they were not given large discounts and trade-in allowances. Ford did not suggest dishonest advertising; but continued to insist upon an increasing volume of purchases. Dealers in Lincolns and Mercurys, as well as in other makes of cars, in Charlotte, Greensboro, and other cities in North Carolina, engaged in blitz selling, to the detriment of plaintiff's business. Ford's field representatives urged Miller to undertake blitz sales, since it was apparent plaintiff could not meet its quota in any other way.

Despite Ford's insistence that its dealers order such a large number of cars that they could not be sold except at substantial discounts, especially toward the end of model years, Ford did not allow any reductions in its own prices to the dealers, except in cases where they exceeded special quotas set by the factory.

Ford's field representatives persuaded Miller to enlarge his facilities on a number of occasions, and insisted that he engage in various advertising and promotional programs. Miller frequently objected to these programs; he was uncooperative, critical of the policies of Ford and its representatives, and at times abusive, belligerent and threatening.

2. Davis was the first president of the plaintiff; he was not a practical automobile man; his principal business was insurance; and Miller bought him out in 1949.

During the period December 1, 1951, to November 30, 1954, plaintiff lost $97,-991.82. By far the greater part of this loss occurred after September 30, 1953, when Miller suggested to the regional and district sales managers that they try to find a purchaser for his business. Miller ordered very few cars after September, 1953, and since his expenses were continuing, he had a large loss.

The complaint alleges numerous instances of discrimination against plaintiff by Ford and its representatives. But the evidence shows no real discrimination. There were the usual number, perhaps more than the usual number, of irritating mistakes and delays with respect to body types ordered by plaintiff, and similar matters, to which big business seems more prone than small. Some of the delays were due to strikes, changes in orders by Miller, and other causes beyond Ford's control. And in view of Miller's lack of cooperation, the field representatives would have been more than human if, when they had three show cars to divide between two dealers, they had not given the break to the more cooperative dealer. But the evidence does not support plaintiff's allegation that Ford discriminated against plaintiff by withholding from it new cars at the beginning of a new model year and loading it down with cars at the end of a model year, or in any other substantial manner. Plaintiff now admits that Ford did not conspire with LMDA to do any of the things alleged in the third cause of action.

In September, 1953, Miller wrote a long letter to the Atlanta District Manager complaining of alleged discrimination against him and other grievances. He sent a copy of this letter to Henry Ford, II. Following a very unsatisfactory conference on September 30, 1953, with the district and regional managers, he insisted that they produce a cash purchaser for his business or stop threatening cancellation if he did not sell more cars. From then on there was constant friction between Miller and most of Ford's representatives with whom he came in contact. In October, 1953, the regional manager recommended to the home office that plaintiff's franchise be terminated. On May 19, 1954, the general sales manager placed this recommendation before the Merchandising Committee, which authorized termination.

The notice of intention to terminate was dated June 1, 1954, and was received by plaintiff June 8, 1954. The letter actually terminating the dealership and sales agreements was dated August 4, 1954, and was received by plaintiff on August 19, 1954.

Plaintiff's dealership was terminated because its performance was not satisfactory to Ford, in that, among other things, plaintiff did not sell enough cars, did not sell enough parts, and did not cooperate with Ford's policies and programs, but was openly and avowedly antagonistic to them. Plaintiff's sales of new Lincolns and Mercurys were well below district, regional, and national averages, and below those of dealers in comparable North Carolina cities. Its operating expenses per new car, unabsorbed expenses per new car and direct selling expenses per new car were far higher than such averages; accordingly, plaintiff's net profit per new car and return on investment were far lower. Ford's termination of its sales contracts with plaintiff was well justified.

Only two out of the 100-odd Lincoln-Mercury dealers in the Southern region have been terminated in the last seven years; five others have resigned upon request. In other words, requested terminations have run about 1% per year.

LMDA.

In 1934, while N. W. Ayer & Son was advertising counsel for Ford Motor Company, another agency, McCann-Erickson, solicited Ford dealers for their advertising, and the first Ford Dealers Advertising Fund (FDA) was organized. Thereafter, thirty-three FDAs were organized throughout the country; some used the same advertising counsel as Ford, some did not. During World War II there was

no dealer advertising; Maxon, Inc., and later J. Walter Thompson handled Ford's institutional advertising. After the war Maxon began reactivating FDAs throughout the United States and was appointed counsel by twenty-four of them, Thompson by nine. In 1946 Thompson acquired all of Maxon's FDA accounts.

When it was announced that the L–M Division would be set up in October, 1946, L–M dealers elected two representatives from each of the six L–M Sales Regions to form the first L–M Dealers National Advertising Council. These delegates met in Detroit in December, 1946, and were unanimous in their desire to form dealer advertising funds separate and distinct from FDAs. Shortly thereafter, LMDAs were organized throughout the United States. Thompson was then handling the Ford Division and the FDA accounts, and it solicited the newly-formed LMDAs; but after the L–M Division appointed Kenyon & Eckhardt (K&E) its advertising counsel, K&E solicited each LMDA separately and signed advertising agency agreements with all of them.

Ford cooperated with the interested dealers in the organization of FDAs and LMDAs. The Jacksonville LMDA was set up in April, 1947, at a meeting of L–M dealers. Some of the L–M dealers at the meeting were also Ford dealers, who had served on the FDA committee. The general plan of the FDA was satisfactory to the L–M dealers, but they wanted to administer their own advertising funds, since they considered themselves in competition with Ford dealers, as well as with dealers in Buicks, Pontiacs, and other makes. They decided unanimously to form an LMDA and elected six directors from their own number, on nominations from the floor.

The directors employed a Jacksonville attorney, who also represented the local FDA, to incorporate the Jacksonville LMDA (J–LMDA); it was incorporated under the laws of Florida as a non-profit corporation. Its charter and its by-laws were similar to those of the FDA. The by-laws provided for a self-perpetuating board of directors; but they were amended in 1954 to provide for the election of directors. The practice in this respect varies among LMDAs.

Before J–LMDA was organized, a charge for L–M dealer advertising had been collected by Ford on the sale of Lincolns and Mercurys and turned over to the district FDA to be administered along with similar charges collected on Ford cars. After J–LMDA was organized, an accounting was had and the unexpended money in the hands of the FDA which had been collected on Lincolns and Mercurys was turned over to J–LMDA.

J–LMDA employed K&E on March 8, 1948. Each LMDA had the right to select its own advertising counsel, but J–LMDA, like the others, selected K&E because it was then representing the L–M Division and had engaged a number of Thompson's employees, who were familiar with the account.

K&E is a well known advertising agency, whose stock is owned by its officers and employees. No officer or director of Ford is an officer or director of K&E.

When an L–M dealer signed his original sales agreements, the Ford representative usually presented him with an LMDA agreement for signature. This agreement recited that LMDA was organized for the mutual benefit of the dealers in the territory, and for the purpose of promoting the sale of new Lincoln and Mercury cars. It authorized the LMDA directors, or the executive committee, to employ an advertising agency, and to advertise Lincolns and Mercurys in various ways. The dealer agreed to contribute to LMDA a specified amount for each new Lincoln or Mercury purchased by the dealer from Ford, payment to be made in such manner as the directors or the executive committee should provide. In practice this provision was treated as an authorization, and the directors fixed the actual amount to be collected from time to time within the limits of the authorization. The

amounts collected varied widely among the LMDAs throughout the country, and varied from time to time within J-LMDA. The LMDA agreement provided that it should continue until terminated, termination to be effective sixty days after receipt by the fund of a written notice from a majority of the members of their desire to terminate the agreement. On the other hand, the by-laws provided that an individual dealer might resign by giving sixty days written notice. After the organization of the Atlanta District by Ford, J-LMDA served both districts; its name was changed, but for convenience it will still be referred to as J-LMDA.

After its president executed the LMDA agreement, plaintiff made contributions to J-LMDA in varying amounts, until the termination of its dealership in September, 1954. At the request of J-LMDA, these contributions were included on the invoices for the automobiles delivered to plaintiff, and Ford transmitted the funds so collected each month to the treasurer of J-LMDA. Supporting data accompanied the check. A firm of certified public accountants employed by J-LMDA rendered periodic financial statements to the executive committee, and plaintiff makes no claim of dishonesty in the handling of these funds either by Ford or by J-LMDA.

Advertising was usually purchased by J-LMDA on a quarterly basis. Ford would forecast to K&E the production of Lincolns and Mercurys for the ensuing year; this forecast would be revised from time to time during the year in the light of actual production. Thus, the money available to J-LMDA for advertising would be estimated. K&E would then propose an advertising program for the ensuing quarter within the funds estimated to be available, and present the program to the J-LMDA advertising committee. In the case of newspaper advertising, K&E generally prepared 25 or 30 ads for consideration, from which a lesser number would be selected by the committee, after they had

been submitted to Ford's advertising department for approval.

Other media employed by J-LMDA in its earlier years included radio spots and chain-break announcements, billboards, movie trailers, direct mail advertising, and banners announcing new models, for display by dealers. The advertising selected often referred to used cars, as well as to new Lincolns and Mercurys. Most LMDA advertising was bought either from K&E or at the suggestion of the defendant, but some was purchased from other sources. Television advertising was a later development.

The district and regional sales managers of the L-M Division had a standing invitation to attend J-LMDA meetings, and the district manager usually attended. They did not dictate the decisions made at those meetings, but were present mainly as a source of information regarding factory plans, new developments, production schedules, etc.

The J-LMDA committee kept minutes, and mailed to all L-M dealers in the district a report of each meeting and of the advertising plans for the ensuing quarter. When K&E placed newspaper or radio ads, the newspaper in the dealer's town was instructed to show the copy to the dealer in advance of publication; if the dealer did not like the ad, he had the privilege of substituting another. In the case of radio spots, the dealer could hear the various spot announcements on the platter sent by K&E to the radio station, and make his selection in advance of the broadcast. The advertising program adopted by J-LMDA was usually kept flexible, so that it could be changed to help a dealer with peculiar problems. In locations where newspaper or radio coverage was inadequate, billboard advertising to the same dollar amount as the proposed newspaper or radio advertising might be substituted. If a dealer preferred that his newspaper ads appear in the classified section, rather than in the display section, as was customary, his ads were changed accordingly. When "make your own deal"

advertising and other blitz advertising commenced in 1953, with the change from a sellers' market to a buyers' market, the committee on a number of occasions permitted a dealer to substitute such advertising for more conventional advertising selected by the committee. K & E wrote blitz advertising for dealers who preferred it.

The J–LMDA committee did not always follow K&E's recommendations. While a basic theme usually ran through all advertising of Lincolns and Mercurys, each LMDA had the right not to follow that theme. The committee frequently made changes in the copy submitted by K&E.

That agency received its compensation in the customary manner; the advertising medium charged the advertisers the regular rate but allowed the agency a 15% commission. LMDAs paid the agency for art work.

J–LMDA first tried to keep accounts for each dealer, showing the amount generated by his purchases and the cost of his advertising. A year or two's experience showed that these amounts generally ran within 5% of each other; thereafter K&E kept records from which any particular dealer's account could be reconstructed to determine if such dealer was receiving his rightful share of advertising, but individual accounting was abandoned. Very few dealers ever asked for an accounting; when they did it was furnished them.

For a period of about two years J–LMDA set aside 40% of each dealer's contribution for the dealer to spend locally through any media he chose. Some of the dealers were lax about spending their money and the plan was abandoned, because the committee understood that tax considerations required it to spend each year substantially all money collected during that year. In January, 1949, J–LMDA increased its assessments $15 per Mercury and $20 per Lincoln for a period of six months, and donated the additional funds to Ford in recognition of the cost of producing and promoting the radically new 1949 line of cars. For a period of six months, in 1953 and 1954, the LMDA committees received $20 per car from the Co-op Fund; in effect, the LMDAs administered the Co-op Fund during that period, pursuant to an agreement signed by plaintiff and other dealers.

The Ed Sullivan TV show went on the air in March, 1949, over some 12 or 15 stations. Several L–M dealers in Atlanta wanted the show in 1949. J–LMDA paid for the show in Atlanta in lieu of newspaper advertising in that city, and the Atlanta dealers guaranteed to make good any excess of the cost of TV over the cost of newspaper advertising there. No other dealers paid any part of the cost of the show in Atlanta. From Atlanta the show gradually spread throughout the district. It went on the air in Greensboro and Charlotte on July 5, 1952. Winston-Salem is within the primary coverage of the Greensboro TV station. Before adding a station, the chairman of the J–LMDA committee would consult the dealers within the primary coverage of the station under consideration; the wishes of a majority of those dealers controlled. Dealers with TV coverage received less advertising through newspapers and other media.

The Ed Sullivan show was carried in all sections of the country, and other LMDAs contributed to its cost. It proved very popular, and as more and more stations were added, the cost exceeded normal LMDA advertising contributions. Beginning about 1951 or 1952, Ford underwrote the deficit between the cost of the show and the LMDA contributions. An L–M TV Fund was established in 1952 or 1953. This fund was administered by six L–M dealers, elected to represent each of the L–M sales regions. As the show became more popular and more expensive, Ford automobile dealers and others wanted to co-sponsor the show, but the LMDAs, with the support of Ford, succeeded in keeping it exclusively for L–M dealer advertising.

The advantages to dealers of LMDA advertising over individual dealer adver-

tising include the following: (1) The cost of art work is shared by dealers in all the LMDAs. (2) The research work and experienced personnel of a national agency produce better advertising copy than an individual dealer could obtain without spending large sums of money. (3) Many small dealers do not have the time or know-how to plan good advertising or to place it intelligently; usually they do not employ any advertising counsel. (4) A coordinated effort repeating a single advertising theme, which is an accepted fundamental of good advertising, can be obtained.

The advantages to dealers of LMDA advertising over co-op advertising administered by the factory include the following: (1) The LMDA committees are familiar with seasonal changes and local problems, such as closed textile mills. (2) The LMDA committees counsel directly with the dealers, and, being dealers themselves, have a better understanding of dealer problems. (3) Factory advertising tends to emphasize styling and comfort, while LMDA advertising tells the public that the automobile is for sale at a particular dealer's place of business. (4) LMDA advertising is more dynamic; it can strike harder and need not be as dignified as factory advertising. In practice, it was not submitted to legal counsel, as Ford's advertising was. (5) LMDA advertising included used car advertising, in which the interest of the dealer was more immediate than that of the factory.

The evidence does not disclose any substantial objection by L–M dealers to LMDA as such, at least until 1954, with the possible exception of Miller, who seems to have been opposed to any advertising of automobiles during the halcyon days following the war. Some time during late 1953 or early 1954, Miller told one or more of Ford's field representatives that he did not like the Ed Sullivan show and thought it was a waste of money; that it gave the impression that if somebody came to plaintiff's place of business he could get an automobile for nothing and plaintiff would not make any profit.

In March, 1954, R. D. Nelligan, an L–M dealer in Greenville, S. C., asked W. A. Toms, manager of the Southern Region of the L–M Division, whether it was necessary for him to participate in LMDA in order to keep his franchise to sell automobiles; Toms told him to take the question up with his LMDA committee.

Later that evening, at a dealer meeting in Atlanta, Nelligan requested a ruling of the LMDA committee whether or not an individual member might resign from LMDA, because his information indicated there might be some official sanction which would make it mandatory that a dealer belong. K. M. Matthews, President of J–LMDA, replied that he could not say for sure, but in his opinion if a dealer did not contribute, he would be taking the risk of the factory cancelling his sales agreements. G. H. Schricker, Manager of the Atlanta District of the L–M Division, was present, and was asked a few moments later what the repercussions would be if a dealer attempted to withdraw from LMDA. He gave an evasive answer. Toms, the Regional Manager, read the minutes of the meeting, and did nothing to correct the impression these questions and answers naturally conveyed.

In effect, participation in LMDA was compulsory. Like other dealers, Miller believed that plaintiff's sales agreements would be cancelled if he refused to pay his LMDA assessments.

If a majority of the dealers in any district became dissatisfied with LMDA advertising, because Ford dominated the agency, or for any other reason, they could have dissolved their LMDA. Indeed, it is hard to see how an LMDA could have been continued, even with Ford's support, against the determined opposition of a substantial minority of the dealers in any area. On the other hand, the pressure of the other dealers would and did require Ford to insist that an occasional recalcitrant dealer should be told that continued member-

ships in LMDA was a condition of continued dealership.

Only one Lincoln-Mercury dealer in the United States, Absey Motors, Inc., Grand Forks, N. D., did not belong to an LMDA between January 1, 1950, and November 4, 1954. Three other dealers were not members of an LMDA during some period between 1945 and 1956. Nelligan is the only dealer who ever requested to withdraw from the J–LMDA.

From 1947 through the end of 1954, total contributions by Lincoln-Mercury dealers throughout the United States to the various LMDA funds totalled approximately $38,790,000. In 1953, they were $8,807,000; in 1954, $7,582,000.

The total LMDA assessments paid by plaintiff after July 29, 1952, amounted to $8,330. These contributions did not deprive plaintiff of the financial means of carrying on its own independent advertising to the extent of $10,750.06 in 1952, $15,403.28 in 1953, and $8,368.47 in 1954. Plaintiff did not feel a need for the services of an advertising agency in preparing or placing this advertising. Over the past four years plaintiff has received not less than $716.37 of advertising in its name in excess of its contributions to the LMDA, and its co-op account had been overspent by more than $4,000. This advertising cost plaintiff no more than if plaintiff had purchased the advertising.

### Parts and Accessories.[3]

The first sales agreements between plaintiff and Ford, signed in 1946, obligated plaintiff not to sell any replacement parts for Lincolns and Mercurys except genuine Lincoln and Mercury parts, unless Ford was unable to supply the parts or unless a purchaser expressly requested plaintiff to use some other part. This was amended in 1949, to obligate plaintiff not to sell as a genuine Lincoln and Mercury part any part which was not in fact a genuine Lincoln or Mercury part. The agreements also obligated plaintiff to maintain a stock of genuine parts and approved accessories of an assortment reasonably comparable to current demand, equivalent to at least one-sixth of its sales of parts and accessories during the previous twelve months.

There was no contract or agreement, express or implied, requiring plaintiff to buy from Ford all or any given percentage of plaintiff's parts and accessories requirements; and, in practice, Ford did not require plaintiff to buy exclusively from it.

During the years 1946 through 1949, numerous accessories were shipped in the trunks of cars delivered to plaintiff, although no written order had been signed for these accessories. The officers of plaintiff, including Miller, and other dealers generally, were entirely satisfied with this practice and made no objection to it, since they made a large profit out of it. Beginning with the 1950 model year, this practice was discontinued and orders for accessories were obtained from plaintiff's parts department.

Certain parts and accessories, such as cylinder blocks and body parts for Lincolns and Mercurys were available only from Ford. Other accessories, such as tires and paint, and parts for other makes of cars, were not sold by Ford. Still other parts and accessories could be bought from either Ford or other suppliers. Examples of this third class were fuel pumps, spark plugs, ignition parts, windshield wipers, transmission gears, anti-freeze, water pumps, seat covers, undercoating, etc.

Plaintiff purchased about half of the third class from Ford and half from other suppliers; of all parts and accessories combined, plaintiff purchased a little more than half from Ford. Most of the parts and accessories purchased from other suppliers were used in the repair and reconditioning of used cars, accepted by plaintiff as trade-ins. How-

---

3. No definition of the word "accessories", as distinguished from the word "parts" is practicable. The use of the terms has varied from place to place and from time to time.

ever, except for fenders and body parts, plaintiff could buy practically everything it needed for Lincoln and Mercury automobiles from automobile supply houses in Winston-Salem; so could an individual motorist. There was no difficulty getting parts almost anywhere, both in and out of the city. Plaintiff listed over fifty suppliers in or near Winston-Salem from whom it purchased parts and accessories.

Ford's field representatives frequently objected to plaintiff keeping in its stockroom parts and accessories purchased from other suppliers, but never threatened to withhold cars or to terminate plaintiff's dealership for that reason. These field representatives made repeated efforts to sell plaintiff a larger quantity of parts. Miller was told that his purchases were substantially below the amount Ford considered satisfactory, and was urged both to increase the volume of his retail sales and to wholesale more parts to garages and other retailers.

Plaintiff would have preferred to purchase a larger portion of certain accessories from outside sources, but Ford's representatives insisted that its dealers were its only customers and that plaintiff had to carry a representative line of Lincoln-Mercury accessories if it was to continue as a franchise dealer. Near the close of model years, the field representatives would insist upon plaintiff buying its proportionate share of the remaining parts and accessories assigned to the region, district and zone, some of which were likely to be very slow sellers. Sometimes there was a reason for this other than the desire of Ford to make its dealers bear the financial load of carrying the parts, sometimes not. Carrying of warehouse stock is recognized by Ford as one of the major functions a dealer performs in the distribution of automobiles. On a number of occasions the general sales manager of the Lincoln-Mercury Division referred to the purchase of seat covers and other parts and accessories dealers didn't want as "franchise insurance".

■ However, I find as a fact that Ford did not require plaintiff to purchase under duress parts or accessories or anything else as a condition of Ford's accepting any of plaintiff's monthly orders for the purchase of automobiles. Plaintiff never complained in writing to Ford about any requirement that it purchase parts and accessories, although Miller wrote numerous letters complaining about other matters.

Miller admits that plaintiff never bought any parts or accessories over the counter that it did not want after the fall of 1952. There is no evidence that plaintiff bought any particular parts or accessories that it did not want after July 29, 1952. After termination of its dealership, plaintiff sold for $15,421 its inventory of parts and accessories, most of which had been purchased since 1952 and which had a book value of $23,122.-60; but there is no basis for any claim that this loss was caused by plaintiff's being required to purchase any accessories it did not want during the applicable period of limitations.

■ While I do not find that Ford required plaintiff to purchase parts and accessories as a condition of Ford's acceptance of individual orders for the purchase of automobiles, I do find that Ford insisted that plaintiff purchase and carry a volume of parts and accessories satisfactory to Ford as a condition of continuing as a franchise dealer. There is no basis for plaintiff's allegation that the pressure on plaintiff to take more parts and accessories had anything to do with the relationship of either plaintiff or defendant with LMDA.

### Discussion.

### I. LMDA—(First Cause of Action).

Plaintiff's claim under the First Cause of Action is based primarily upon United States v. General Motors Corp., 7 Cir., 121 F.2d 376, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, rehearing denied 314 U.S. 710, 62 S.Ct. 178, 86 L.Ed. 566. In that case the indictment charged and the evidence showed that General Motors Corp., General Motors

Sales Corp., and General Motors Acceptance Corp. conspired to restrain unreasonably interstate trade and commerce in GM cars; that their purpose was to control the financing essential to the wholesale purchase and retail sale of GM cars; and that in furtherance of this purpose the conspirators devoted themselves to concerted action by which GMAC financing was imposed on dealers who were engaged in the purchase and sale of such cars.

There are many similarities between that case and the case at bar, but also many vital distinctions.

First, the similarities. Ford is one of three corporations holding dominant positions in the automotive industry. GMC was and is the largest. The facts set out above under the headings "The Industry" and "The Defendant and its Sales Agreements" are similar to those found in the GMC case.

In the General Motors case the court said, 121 F.2d at page 398: "The record leaves no doubt that the dealer body as a whole was made acutely aware and had knowledge of the set policy of the appellants with respect to use of GMAC financing facilities. The fear of cancellation or refusal to renew contracts was great, so much so that the dealer was reluctant to refuse the terms and policies dictated by the appellants." In the instant case fear of cancellation was equally great; and the other dealers would no doubt have required Ford to terminate any dealer who refused to contribute to his LMDA, but sought to obtain a free ride on the TV and other LMDA advertising in his area.

But the distinctions between the General Motors case and the instant case are even more important.

GMAC was owned by GMC; the conspirators had identical interests, to make money for the GMC family. But the interests of Ford and the LMDAs are not identical. Ford does not own or control the LMDAs; they are composed of L–M dealers, who are interested in promoting the sale of Lincolns and Mercurys against Ford cars as well as against cars made by other manufacturers. Nor does Ford own any interest in the advertising agency used by the LMDAs.

GMAC was selling financing and was in active competition with other finance companies. Neither Ford nor LMDA is selling advertising. Both of them are buying advertising—sometimes in the same and sometimes in different media, usually through the same but sometimes through different advertising agencies. Each LMDA had the right to select its own agency or agencies; it usually selected the agency used by Ford, but this selection was made for sound business reasons advantageous to dealer members. Other agencies and all media had a right to compete for the advertising purchased by the LMDAs; many different media were used; and the LMDAs purchased some advertising from outside agencies.

The requirement of GMAC financing was an unreasonable arrangement, so far as the dealers were concerned; it was designed solely to promote the selfish interests of GMAC. LMDA advertising is a reasonable arrangement, designed to promote the interests of L–M dealers by furnishing them with effective advertising at a minimum of cost through cooperative effort.

GMC required dealers to promise to use GMAC financing exclusively. Ford did not require L–M dealers to use LMDA advertising exclusively or to promise to use it exclusively; in fact, it was not used exclusively by plaintiff, which spent many thousands of dollars for other types of advertising in local papers and other media. Plaintiff's officers signed the original LMDA agreement voluntarily without any threats from Ford. Although Miller now says that he was dissatisfied with some of the advertising in the early years and again in late 1953, neither he nor any other dealer ever sought to withdraw from LMDA until 1954.

GMAC financing was found to have prevented many members of the public from buying GMC cars. It has not been shown that the cost of LMDA advertising had any such effect. The purpose

and effect of the advertising was to increase the sale of L–M cars.

Restraining of commerce in GMC cars through sale of financing was not necessarily inconsistent with the interests of GMC, for GMC made a profit directly from GMAC financing. The suggestion in the GMC case "Sometimes it is good business to sacrifice car sales in order to increase the sale of a complementary product or service" has no application here. Ford made nothing directly from LMDA advertising; the indirect benefit it got from LMDA advertising was matched by the benefit the dealers got from Ford's own advertising of Lincolns and Mercurys and by Ford's contributions to the cost of the Ed Sullivan show. Moreover, LMDA advertising promoted Lincolns and Mercurys against Fords, as well as against cars of other manufacturers; Ford car dealers had their own advertising funds, which promoted Fords as against Lincolns and Mercurys.

The Seventh Circuit held, 121 F.2d at page 400, that the restrictions imposed upon the financing of the wholesale and retail sale of General Motors cars bore no reasonable relation to manufacturer's good will. The court recognized, however, 121 F.2d at pages 400, 403, that it is proper for a manufacturer to promote its good will and to protect itself against inefficient as well as unscrupulous dealers, citing Pick Mfg. Co. v. General Motors Corp., 7 Cir., 80 F.2d 641, affirmed 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4; cf. International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085.

The Seventh Circuit also noted, 121 F. 2d at page 404: "The finance restriction operates on the retail purchaser as well as on the dealer, and the competing discount companies are unable to finance General Motors cars. The parts restriction in the Pick case operated on the General Motors dealer only, and the competition of other parts manufacturers was not completely destroyed." The case at bar is similar to the Pick case in those respects, and not to the General Motors case.

Plaintiff does not claim that the effect of the LMDA arrangement was to create a monopoly in the manufacture and sale of automobiles, either nationally or locally, but "to create a monopoly in the interstate trade and commerce in Lincoln and Mercury automobiles and accessories and advertising used for the sale of said automobiles." However, as the Supreme Court noted in United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 393, 76 S.Ct. 994, 100 L.Ed. 1264, every manufacturer has a natural monopoly in his own product, especially when sold under his trade-name, and such a monopoly is not prohibited by the antitrust laws. Se also Arthur v. Kraft-Phenix Cheese Corp., D.C.Md., 26 F.Supp. 824; Schwing Motor Co. v. Hudson Sales Corp., D.C.Md., 138 F.Supp. 899, affirmed 4 Cir., 239 F.2d 176. The issues arising out of the sale of parts and accessories will be discussed in the next section of this opinion.

Ford manufactures and sells automobiles, not advertising; it is not seeking to enter the field of selling advertising. The LMDAs were organized for the purchase of advertising, not its sale. The TV and radio networks and stations, newspapers and other advertising media do the selling. All of the tying cases, which will be discussed below, involve efforts by a defendant to tie one of his own products to the sale of another of his products—never to the sale of somebody else's product; "the essence of illegality in tying agreements is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next." Times-Picayune Publishing Co. v. United States, 345 U.S. 594, at page 611, 73 S.Ct. 872, at page 882, 97 L.Ed. 1277. No such exploitation is involved in LMDA advertising. It is true that Ford obtained an indirect benefit from LMDA advertising; but that benefit is offset by the benefit obtained by dealers from Ford's advertising of L–M cars and by Ford's contribution to the TV advertising done by LMDA. Nelligan, the Greenville, S. C., dealer who has a simi-

lar suit against Ford, conceded that LMDA had "accomplished a necessary job" and had increased the sale of Lincoln and Mercury automobiles.

■ Even a true tie-in sale is not prohibited under Sec. 3 of the Clayton Act unless, in the language of the statute, the effect "may be to substantially lessen competition or tend to create a monopoly * * * ". The effect of aggressive advertising of L–M cars is to promote competition between those cars and other makes, not to lessen such competition.

■ Nor has there been any restraint of competition in or tendency toward monopolization of advertising. Each LMDA is free to choose its own agency and the media for its advertising. In practice, several agencies and many different media have been used, including newspapers and radio stations in the dealers' home towns. Some advertising agencies or advertising media may lose some dealer advertising as a result of coordinated LMDA advertising; that is true of any advertising by any association, because it is possible, indeed probable, that some members would do more individual advertising if they did not participate in coordinated advertising. But advertising by associations does not violate the Sherman Act unless it restricts competition or tends to create a monopoly to an extent far beyond anything suggested in the present case. In addition to its LMDA and co-op advertising, plaintiff spent locally each year substantial sums for advertising which plaintiff itself selected.

■ Finally, private suits under 15 U.S.C.A. § 15 are maintainable only when the defendant's conduct has caused some injury to the public generally, as distinct from purely personal or private damage. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885, at page 889; Schwing Motor Co. v. Hudson Sales Corp., D.C.D.Md., 138 F.Supp. 899, at page 903, affirmed 4 Cir., 239 F.

2d 176; Arthur v. Kraft-Phenix Cheese Co., D.Md., 26 F.Supp. 824, 826; Feddersen Motors, Inc., v. Ward, 10 Cir., 180 F.2d 519; Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268, certiorari denied 348 U.S. 821, 75 S.Ct. 34, 99 L.Ed. 648; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236. No such injury to the public has been shown in this case.

■ Defendant has not violated the antitrust laws with respect to any matter alleged in the First Cause of Action. It did not conspire with LMDA to restrain unreasonably interstate trade and commerce in L–M cars or accessories, or the advertising thereof, in violation of Sec. 1 of the Sherman Act. It did not conspire with or through LMDA or otherwise to monopolize interstate trade and commerce in L–M cars and accessories nor to monopolize interstate trade and commerce in the advertising of said cars and accessories, in violation of Sec. 2 of the Sherman Act. LMDA payments made by plaintiff were not tied in with the sale of defendant's products to plaintiff, in violation of Sec. 3 of the Clayton Act.

II. Parts and Accessories— (Fourth Cause of Action).

Sec. 3 of the Clayton Act, 15 U.S.C.A. § 14, prohibits a lease or sale of goods "on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce".

Plaintiff admits that there was no express condition, agreement or understanding that plaintiff would not use or deal in the goods of a competitor or competitors of Ford. Plaintiff further admits that it did so deal, to a substantial extent. Plaintiff also agrees that the sales agreements were not "requirements" contracts. Its counsel argues: "Thus the question of a violation of

Section 3 of the Clayton Act must be viewed from the standpoint of each individual sale, and whether or not the sale of each individual automobile was made on the condition that the dealer also purchase advertising, parts and accessories bearing no reasonable relation to the protection of the manufacturer's good will. If such a condition existed, then it becomes immaterial whether or not the sale or condition was accompanied by threats or pressure. In such a case it is the condition itself that invokes the violation, and not the means by which the condition may have been enforced."

But Ford did not require plaintiff to purchase parts and accessories as a condition of Ford's acceptance of individual orders for the purchase of automobiles. Ford did insist that plaintiff purchase and carry a volume of parts and accessories satisfactory to Ford as a condition of continuing as a franchise dealer; and terminated plaintiff's franchise agreement because plaintiff did not sell enough automobiles and enough parts and accessories to satisfy Ford, along with other reasons.

The problem in the instant case is complicated by the fact that plaintiff occupied a dual role with respect to parts and accessories. In some instances it was the the ultimate consumer, i. e., when it used parts to repair Lincolns, Mercurys or other makes of automobiles which it owned. In other instances it was a dealer, sometimes a wholesaler and sometimes a retailer, selling some parts and accessories purchased by it under its franchise agreement with Ford, and other parts and accessories purchased by it from other sources for resale to its customers.

 Ford had the undoubted right to require plaintiff not to sell as genuine parts any parts that were not genuine, and might have required plaintiff to use only parts and accessories supplied by Ford in repairing Lincoln and Mercury automobiles. Pick Mfg. Co. v. General Motors Corp., supra. Such a provision is designed to maintain the good will of the public toward the manufacturer's au-

tomobiles. Plaintiff does not question Pick, so far as the sale or use of genuine L-M parts is concerned, and Ford does not contend that the Pick doctrine extends to all accessories. Ford does argue that the same reasoning should extend to such accessories as rear view mirrors, seat covers, heaters and radios, which are frequently purchased as part of the car or installed by the dealer at the time of the sale.

 Ford also contends that it had the right to require plaintiff to carry a representative line of L-M Division accessories, if it was to continue as a franchise dealer, since it was the only franchise dealer of that division in Forsyth County, in which Winston-Salem is located. There is considerable force in this argument, and I conclude that it justifies the pressures which Ford applied to plaintiff in this case. It is not necessary to decide how far the argument might support a manufacturer in a different case.

 It has been repeatedly held that a single manufacturer has a right to select its customers and to refuse to sell its goods to any one, for reasons sufficient to itself. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U. S. 565, 44 S.Ct. 162, 68 L.Ed. 448; Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L. Ed. 1277; Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46. A refusal to deal becomes illegal only when it produces an unreasonable restraint of trade or a monopoly forbidden by the antitrust laws. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162; Schwing Motor Co. v. Hudson Sales Corp., D.C.D.Md., 138 F.Supp. 899, affirmed 4 Cir., 239 F.2d 176. A manufacturer has the right to develop its enterprise intelligently by promoting productive business relationships and channels

of distribution, while abandoning those which are relatively barren.

In Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268, certiorari denied 348 U.S. 821, 75 S.Ct. 34, 99 L.Ed. 648, the court held that the exercise by Hudson of its right not to renew a dealer's franchise could not form the basis of a suit under 15 U.S.C.A. § 15, even if the evidence had shown that Hudson had done so only because the dealer had refused to give up in the future his other agencies and center his efforts on, and give his undivided attention to, Hudson and Hudson products. To the same effect is Nelson Radio & Supply Co. v. Motorola, 5 Cir., 200 F.2d 911, certiorari denied 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356, where the court noted that in all of the cases decided by the Supreme Court involving Sec. 3 of the Clayton Act there was an agreement and not a mere refusal to deal. Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, discusses the earlier cases, and they need not be reviewed here. There was also an express agreement in the later Supreme Court cases. Richfield Oil Corp. v. United States, 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1344, rehearing denied 343 U.S. 958, 72 S.Ct. 1049, 96 L. Ed. 1358; Times-Picayune Publishing Co. v. United States, supra.

The Nelson case was cited with approval in Allied Equipment Co., Inc., v. Weber Engineered Products, Inc., 4 Cir., 237 F.2d 879. In that case Allied contended that Weber, by attempting to use the threat of cancellation to force Allied to enter into an illegal exclusive dealing contract, violated Sec. 3 of the Clayton Act. Judge Prettyman, writing for the Fourth Circuit, said, 237 F.2d at page 883: "Allied faces a dilemma on the point. If there was no contract denying it the right to handle products competitive to Weber, there was no violation of the antitrust laws. If there was such a contract, as we have already pointed out the breach was by Allied and so no damages accrued to it."

Emich Motors Corp. v. General Motors Corp., 7 Cir., 181 F.2d 70, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534, and 7 Cir., 229 F.2d 714, may be in conflict with Allied v. Weber if the statement quoted above is taken to refer to all antitrust laws. But if the statement quoted is taken to refer only to the Clayton Act, which was the only act relied on by the plaintiff in that case, and not to the Sherman Act, there is no conflict between Allied v. Weber and Emich v. GMC. Emich owned his own finance company and insisted upon using it in preference to GMAC; his motor company did not enter into any agreement with GMAC. Both the motor company and the finance company were plaintiffs in the case, and GMC and GMAC were defendants. A prima facie case of conspiracy and coercion was made out by offering in evidence defendant's criminal conviction under the Sherman Act, United States v. GMC, supra. All Emich had to do was to show that his companies were damaged by the conspiracy. Sec. 3 of the Clayton Act was not involved in the case.

Sec. 3 of the Clayton Act was designed to protect the competitors of a seller from being foreclosed from the market. Hudson v. Waldrip, supra; Nelson v. Motorola, supra; Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236; Feddersen Motors, Inc. v. Ward, 10 Cir., 180 F.2d 519; Riedley v. Hudson Motor Car Co., D.C.W.D.Ky., 82 F.Supp. 8; Dublin Distributors, Inc., v. Edward & John Burke, Ltd., D.C.S.D.N.Y., 109 F. Supp. 125, 61 Yale Law Journal, 1010, 1048 (1952). Suits by dealers against automobile manufacturers have been generally unsuccessful because the dealers have been unable to show any injurious effects on the public automobile market. Schwing v. Hudson, supra; Feddersen v. Ward, supra; Riedley v. Hudson, supra. See also Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885, 889. None is shown here. There can be no recovery by a private litigant under

the antitrust laws in the absence of a public injury. See cases cited on this point near the end of Section I of this discussion.

In Times-Picayune v. United States the majority opinion held that "the essence of illegality in tying agreements is the wielding of monopolistic leverage; * * *. Solely for testing the strength of that lever, the whole and not part of a relevant market must be assigned controlling weight." 345 U.S. 594, 611, 73 S.Ct. 872, 882, 97 L.Ed. 1277. "When the seller enjoys a monopolistic position in the market for the 'tying' product, *or* if a substantial volume of commerce in the 'tied' product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act, because from either factor the requisite potential lessening of competition is inferred." 345 U.S. 608, 609, 73 S.Ct. 880. Ford does not enjoy a monopolistic position in the automobile industry. The total volume of its business in parts and accessories does amount to a substantial volume of commerce; but by far the greater part of that volume is represented by "genuine" parts and accessories, which it is conceded by every one Ford has a right to require its dealers to handle and use. Pick v. GMC, supra. Ford's total commerce in seat covers, undercoating and similar accessories is not negligible, viewed on a national basis. But there was no evidence of any substantial restraint of commerce even in those items. Plaintiff bought seat covers, undercoating, etc., from many other sources as well as from Ford. It purchased from other sources nearly half of all the parts and accessories which it sold or used, more than half of all except "genuine" Lincoln-Mercury parts. Rival suppliers had no difficulty in securing consumer access. More than fifty suppliers in or near Winston-Salem sold parts and accessories to plaintiff. Ford's competitors were not foreclosed from the market. And there is no evidence that *any* parts or accessories were sold to plaintiff against the will of its officers within the three year period before this suit was filed.

 Plaintiff admits that there was no express condition, agreement or understanding that it would not use or deal in parts and accessories supplied by others, except when it was undertaking to use or supply "genuine" Lincoln-Mercury parts or accessories. I find that there was no such implied condition, agreement or understanding, and that the sales agreements did not have that practical effect.

 Plaintiff has not shown any violation by Ford of Sec. 3 of the Clayton Act in connection with the sale of parts and accessories, at least within a period of three years before the action was filed. Moreover, plaintiff has not shown that it sustained any damages in connection with parts and accessories as a result of anything done by Ford or its representatives within the three year period.

### III. Domination and Monopoly— (Fifth Cause of Action).

The power which Ford possessed to control its dealers is shown by the facts set out under the heading "The Industry" in the statement of facts above. They are the same facts found by the Congressional Committees in 1956. Plaintiff contends that the existence of this power, and its exercise by Ford to the extent shown by the findings of fact, amounted to "economic slavery" and "market domination or distribution control", violated Sec. 2 of the Sherman Act, and entitled plaintiff to sue the manufacturer under the act for any losses it may have sustained by reason of such domination.

Congress evidently did not share this view; it found it necessary to adopt an entirely new statute "to supplement the antitrust laws of the United States, in order to balance the power now heavily weighted in favor of automobile manufacturers, by enabling franchise automobile dealers to bring suit in the district courts of the United States to recover damages sustained by reason of the fail-

ure of automobile manufacturers to act in good faith in complying with the terms of franchises or in terminating or not renewing franchises with their dealers". See title of P.L. 1026, 84th Cong., 2d Sess., August 8, 1956, Chap. 1038, 70 Stat. 1125, 15 U.S.C.A. § 1221 et seq., U.S.C.Cong. & Adm.News 1956, p. 1333.

Nowhere in the Senate and House reports is it suggested that a dealer has such a remedy as plaintiff seeks to establish under the fifth cause of action. On the contrary, the Senate Committee stated, Report No. 2073, p. 3: "Dealers seeking redress for grievances under these franchises found themselves effectively foreclosed in attempting to bring suit upon the franchises. The terms of this one-sided document compelled the courts to conclude that, however inequitable the consequences, the dealer executing such a franchise had, for all practical purposes, surrendered his right to litigate his grievance. This has been the prevailing view of courts, both Federal and State, in passing upon suits filed by dealers under the franchises. Representative of the thinking of the courts is the decision in Ford Motor Co. v. Kirkmyer Motor Co., 4 Cir., 1933, 65 F.2d 1001, where the court stated: 'While there is a natural impulse to be impatient with a form of contract which places the comparatively helpless dealer at the mercy of the manufacturer, we cannot make contracts for parties or protect them from the provisions of contracts which have been made for themselves. Dealers doubtless accept these one-sided contracts because they think that the right to deal in the product of the manufacturer, even on his terms, is valuable to them; but after they have made such contracts, relying upon the good faith of the manufacturer for the protection which the contracts do not give, they cannot, when they get into trouble, expect the courts to place in the contract the protection which they themselves have failed to insert.' "

Plaintiff's principal reliance is upon certain statements in the opinion of the Seventh Circuit in United States v. General Motors Corp., 121 F.2d 376. After recognizing that it is proper for General Motors (or Ford) to promote manufacturer's good will and to protect the manufacturer against inefficient and unscrupulous dealers, the court said that "there is a limit to how far a manufacturer may go to control the whole process of distribution". 121 F.2d at page 400. It should be noted that the finance restriction in that case operated on the retail purchaser as well as on the dealer. There is no similar restriction in this case. Discussing the question of domination, the Seventh Circuit said: "For that matter GMC has always dominated the market for General Motors cars to a considerable extent, but it was only when control of the marketing process was perfected by the appellants and was directed at the creation of an artificial noncompetitive market for GMAC, that it extended beyond legitimate business demands and became a menace to the interests of the public." 121 F.2d at page 403.

The statement contained in the last quotation has been approved by the Fourth Circuit. Schwing Motor Co. v. Hudson Sales Corp., D.C.D.Md., 138 F. Supp. 899, 906, affirmed 4 Cir., 239 F.2d 176.

Plaintiff's counsel admit that no reported case allows recovery to a dealer against a manufacturer under the domination theory they advance. I conclude that such "market domination or distribution control" as Ford may have exercised, or such "economic captivity" as it may have imposed on the plaintiff, did not amount to a monopolization of, or an attempt to monopolize, any part of the trade or commerce among the several States, in violation of Sec. 2 of the Sherman Act.

### Conclusion.

Plaintiff is not entitled to recover under any cause of action in this case. This conclusion makes it unnecessary to pass on the question of the applicable statute of limitations, to go more fully into the matter of damages, or to consider the question of plaintiff's attor-

neys' fees. Plaintiff is entitled to receive the $1,417.10 due it for repairs to automobiles, which defendant paid into court. I direct the Clerk to pay that amount over to the plaintiff forthwith.

Enter judgment for the defendant, with costs.